ROBERT CRUM,

      Plaintiff,

  v.

ADVOCATE NORTH SIDE HEALTH
NETWORK,

      Defendant.

No. 16 CV 8951

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Crum brings this action against his former employer, defendant Advocate North Side Health Network, for age discrimination, retaliation, and a hostile work environment under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* Advocate moves for summary judgment on Crum's claims. That motion is granted.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and reasonable inferences in the light most

favorable to the non-moving party. *Roh v. Starbucks Corp.*, 2018 WL 663093, at *2 (7th Cir. 2018).

## II. Background

Robert Crum worked as a Public Safety Officer for Advocate Illinois Masonic Medical Center. [56] ¶¶ 1–2.[1] During the period of Crum's employment that is relevant to this case, Lee Matthews was Crum's supervisor. *Id.* ¶ 2. Crum and Matthews were both born in 1953. *Id.* ¶ 2.

Advocate has a progressive disciplinary policy, which describes the bases for discipline and the various levels of discipline. *Id.* ¶ 4. Level 1 and 2 Corrective Actions are warnings that are "active" for six months, meaning that if an employee on one of those levels receives another corrective action, then that new corrective action will be deemed to be at the next highest level. *Id.* Level 3 is a final warning, and it is "active" for one year; if an employee is disciplined within one year of receiving a Level 3, then that employee may be terminated. *Id.* The policy includes a "Just Culture Decision Matrix," which helps managers to make fair decisions in disciplining employees. *Id.*

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Crum's responses to Advocate's Local Rule 56.1(a) statements, [56], and Advocate's responses to Crum's Local Rule 56.1(b)(3)(C) statements, [74], where both the asserted fact and the opposing party's response are set forth in one document. Neither party strictly adhered to the Local Rules in drafting their statements of facts—both parties included arguments in their statements of facts and their responses. When the parties raised arguments in their statements, included additional facts in their responses or replies, failed to support their statements by admissible evidence, or failed to cite to supporting material in the record, I disregarded those portions of those statements, responses, or replies. Finally, I only considered facts that were properly controverted to be disputed.

Additionally, Advocate has an Associate Conflict Resolution program, which allows an employee to submit certain workplace concerns for resolution, such as a challenge to a corrective action. *Id.* ¶ 7. First, the employee is encouraged to resolve the matter by conferring with his manager. *Id.* If the situation is not resolved, then the employee must contact a Human Resources Professional within seven calendar days. *Id.* At that point, the unresolved issues may be addressed under one of five different "tracks" or methods of resolution. *Id.* One of these tracks involves facilitated discussions between the employee, his manager (or the manager's superior), and a Human Resources Professional. *Id.* If the issue is still unresolved after having been submitted to one of these five tracks, then the employee may formally request either mediation or arbitration. *Id.*

## A. Crum's Employment History

On May 19, 2015, Matthews gave Crum a Level 1 Corrective Action Notice.[2] *Id.* ¶ 5; *see also* [52-1] at 276, 280. The CAN stated that Crum used the department radio to broadcast rude and discourteous comments about another public safety officer on April 24, 2015, in violation of Advocate's policies. [56] ¶ 5; *see also* [52-1] at 280. At his deposition, Advocate asked Crum if he recalled using the radio in April 2015 to criticize another officer; Crum testified: "I recall talking over the radio but not – not this incident. It was just the opposite of the way that he got this written." [52-1] at 40–41, 153:16–154:4. When Advocate followed up by asking what

_____

[2] Crum attempts to dispute this statement and others involving his CANs by attacking the validity of the basis for the CAN; but his response and his citations to the record do not controvert the relevant statements of fact.

Crum *did* recall, he said: "I don't – I don't remember the incident." *Id.* at 41, 154:5–6.

On June 22, 2015, Matthews gave Crum a Level 2 CAN, which stated that Crum slept while on duty and that he failed to communicate with fellow public safety officers. [56] ¶ 10; *see also* [52-1] at 300, 304. Matthews concluded that Crum engaged in such behavior after Matthews reviewed relevant video footage and conducted interviews with relevant staff. [56] ¶ 11. Then, on September 22, 2015, Matthews gave Crum a Level 3 CAN, which stated that Crum failed to properly screen a patient's property for contraband. *Id.* ¶ 19; *see also* [52-1] at 375; [52-5] at 108. Matthews concluded that Crum engaged in such behavior after Matthews reviewed video footage and conducted interviews with staff. [56] ¶ 20. Per advice from Advocate's Associate Relations Specialist, Robert Favaro, Matthews applied Advocate's Just Culture Decision Matrix to Crum's case and Matthews decided to give Crum a Level 3 CAN for the incident, instead of terminating Crum at that time. *Id.* ¶ 21; [52-5] at 2, ¶ 2.

Crum used Advocate's Associate Conflict Resolution program to object to all three of the CANs he received. [56] ¶¶ 6, 13, 22. Pursuant to this program, Crum met with Matthews, Favaro, and the Administrator of Finance on two separate occasions—first to discuss his concerns about the Level 1 CAN, and next to discuss his concerns about the Level 2 CAN. *Id.* ¶ 8, 13. Ultimately, the finance

administrator decided to uphold both CANs. *Id.* ¶¶ 8, 13.[3] With respect to his Level 3 CAN, Crum met with Matthews and Favaro to discuss his objections, *id.* ¶ 22,[4] and after that meeting, Matthews decided to uphold the Level 3 CAN, [52-5] at 8, ¶ 35.

Unsatisfied with Advocate's reconsideration of his disciplinary actions, Crum pursued arbitration through Advocate's Conflict Resolution program. [56] ¶ 24. Crum wished to arbitrate all three of his CANs, but Favaro decided to narrow the subject of the arbitration to Crum's Level 3 CAN, since the first two were over six-months old, thereby rendering them inactive under Advocate's policy. *Id.* The arbitration did not occur because Crum did not submit the required forms. *Id.* ¶ 27; *see also* [52-5] at 10, ¶¶ 43–46.

Nevertheless, Crum maintains that the incident involved in the Level 1 CAN "happened just the opposite of the way that Matthews wrote it down." [67] ¶ 61. In other words, it was the other officer and not Crum who displayed rude and discourteous behavior. *Id.* Although Crum does not believe that he was rude, he does admit that he used the radio to broadcast a comment about the other officer sleeping. *Id.* As for the Level 2 CAN, Crum says that Advocate relied on an unsubstantiated report by a security guard that Crum was sleeping and that the image that the guard supposedly took of Crum does not look like Crum nor does it

---

[3] Crum disputes the finance administrator's involvement, [56] ¶ 8, but the affidavit paragraph that Crum cites to for support does not discuss this topic; therefore, Crum has not controverted this fact.

[4] Crum disputes this statement, but also, he admits that he has no personal knowledge of any discussions Matthews and Favaro had; his assertion does not controvert Advocate's statement.

look like a sleeping person. *Id.* ¶¶ 63–64. With respect to the Level 3 CAN, Crum says he was at home and not working when the patient was improperly screened and was able to sneak a box cutter into the facility. *Id.* ¶ 65. Crum points to surveillance video of him working during his midnight shift. *Id.* Such evidence, however, does not prove that Crum was at home and not working earlier in the day, when the box cutter escaped detection. Crum's reliance on statements by the nurse who authored a report about the incident is improper, *see id.* ¶¶ 66–67; the nurse's statements are inadmissible hearsay. The same is true of Crum's reference to conversation he overheard two staff members having about the incident. *Id.* ¶ 68.

On March 6, 2016, the Chicago Police Department arrested Crum because a fellow public safety officer had called the police alleging that he felt threatened by Crum. [56] ¶ 28; *see also* [52-4] at 11, ¶ 45; [67] ¶ 42. Matthews was not on-site during the incident, and he did not direct anyone to call the police, nor did he request that the police arrest Crum. [56] ¶ 28. Due to company policy, Advocate suspended Crum during the investigation into his arrest.[5] *Id.* ¶ 29. After the investigation concluded, Advocate did not discipline Crum; instead, Advocate

---

[5] In August 2015, when a thirty-four year old public safety officer was arrested on allegations of stealing money, Matthews suspended that officer without pay and only reinstated the officer after the investigation concluded. [56] ¶ 32; [52-4] at 12, ¶ 54. Crum disputes this statement by saying that his research (using a public arrest database) did not confirm that the officer had been arrested; but, Crum admits that he did not have knowledge of this incident or of Matthews's decisions regarding suspension and reinstatement; thus, he does not controvert Advocate's statement.

reinstated Crum and after some delay due to an "oversight," Advocate granted Crum his back pay for the duration of his suspension.[6] *Id.* ¶¶ 30–31.

A few months before the arrest, Matthews rated Crum as "Approaching Expectations" on his performance evaluation because of Crum's "performance issues."[7] *Id.* ¶ 34; *see also* [52-4] at 12–13, ¶ 58. Several weeks after his arrest, Crum met with Matthews and the Director of Human Resources, Bill Corbin, to discuss his continuing poor performance. [56] ¶ 36. Matthews and Corbin presented a "Memo of Concern" to Crum and instructed Crum to obey its instructions since he was already on a Level 3 CAN. *Id.*

In 2016, Crum asked Matthews for a shift transfer within Advocate's Public Safety Department. *Id.* ¶ 79. Crum also tried to transfer to other Advocate facilities. *Id.* ¶ 83. At the time of those applications, Crum's Level 3 CAN was in effect. *Id.* Advocate rejected Crum's four applications and offered employees ranging from ages thirty-three to sixty-one each of the positions. *Id.* Although Crum believes that HR, specifically Corbin and Favaro, prevented his applications from being accepted, Crum's citation to the record does not contain admissible evidence to support his theory. *Id.*; *see also* [67] ¶ 85. Rather, recruiters at Advocate's headquarters rejected

---

[6] Crum did not receive the full amount of back pay that he was owed until after he filed a wage complaint against Advocate with the Illinois Department of Labor. [74] ¶ 45. Advocate denies that it corrected the oversight simply *because* Crum filed the claim. *Id.*

[7] Previously, in 2012 and 2014, Matthews gave Crum an overall rating of "Meets Expectations." [74] ¶ 13. Accordingly, Crum disputes that he had any performance issues; he asserts that the real reason behind Matthews's performance review rating was Advocate's recent "up or out" policy concerning old employees. [56] ¶ 34. Crum's opinion, however, does not controvert Advocate's statement of fact regarding Matthews's explanation of his own reasoning.

Crum's applications at the initial screening phase, and neither Corbin nor Favaro had any involvement in that process. [56] ¶ 86. Three of the positions to which Crum applied would not have provided a higher pay rate than what Crum was already receiving at the time he submitted his applications; and one of the positions would have provided a lower pay rate. *Id.* ¶ 84.

Advocate terminated Crum on June 23, 2016; the termination notice stated that on May 31, 2016, Crum failed to properly communicate with his fellow officers and that he failed to double-check a patient's property, as he was required by Advocate policy. *Id.* ¶ 40. Crum does not believe that the reasons Matthews gave for terminating him were genuine; he says that Matthews terminated him only after Crum refused to take a retirement option and that only after his refusal did Matthews claim that he was terminating Crum for failing to communicate with co-workers, failing to double-check a bag, and failing to wand a bag (all of which Crum says was not true). *Id.* Crum's assertions, however, do not controvert Advocate's statement regarding Matthews's belief about his own reasoning. Matthews investigated the May 31, 2016 incident by reviewing relevant surveillance footage, emails, and records. *Id.* ¶¶ 40–41. Matthews also discussed the matter with Corbin and Advocate's legal department, which led Matthews and Corbin to the decision that termination was the appropriate response. *Id.* ¶ 42. Crum met with Matthews and Corbin to discuss his policy violations; but since Crum did not provide any information to negate their conclusion that he had violated Advocate policy, they

informed Crum that Advocate was terminating him.[8] *Id.* ¶¶ 43, 45. The parties dispute whether they discussed Crum's retirement during this meeting.[9] *Id.* ¶ 43.

Using Advocate's Conflict Resolution program, Crum objected to his termination. *Id.* ¶ 50. This prompted Matthews and Favaro to contact Crum to schedule a meeting. *Id.* Crum did not respond and eventually, Advocate closed the Conflict Resolution case regarding his termination. *Id.* Yet, Crum remains convinced that the asserted bases for each of his CANs were invalid. [67] ¶ 60.

### B. Advocate's Treatment of Older Employees

There is no evidence that Advocate had a plan to replace older employees with younger employees.[10] [56] ¶ 71. The email that Crum relies on to claim that Advocate has such a policy, can be summarized as follows: Corbin emailed Matthews on November 10, 2015 to "check in on the progress and accountability" of the associates that Matthews had rated as "a low performer" because Advocate sought to gather more data about its "efforts to move low performers up or out." [65-2] at 50. Corbin requested that Matthews identify any associate that had been given "a DAW, Memo of Concern, Coaching, or other type of Pre-Corrective action

---

[8] Crum says he could not have provided any information to negate Advocate's conclusion because he did not know in advance of the meeting that he would be discussing his potential termination. [56] ¶ 45; *see also* [67] ¶ 15.

[9] On August 31, 2015 and September 2, 2015, Crum left voicemails on Matthews's phone. [56] ¶ 14. In his affidavit, Crum explains that in the voicemails he said: "I was fed up and that I was going to retire," but he also explains that he left those voicemails out of frustration and that he did not, in fact, intend to retire. [67] ¶ 38.

[10] Crum disputes this statement by asserting facts about Advocate's announcements regarding its budget and staffing needs in light of the potential and then failed merger with NorthShore University Health System; those assertions do not controvert Advocate's statement. [56] ¶ 71.

notification" and to identify any associate who is improving and who will no longer be a low performer. *Id.* at 51. Crum's name and three other names (Franklin, Genever, and Robert) appeared under "Current List." *Id.* Matthews responded: "Ms. Franklin has retired. Mr. Crum as you know has been struggling." *Id.* at 50.

Facially, Corbin's email describes Advocate's intention to move low performers "up or out"; and Matthews's response confirms that Crum continues to not meet performance expectations. Crum testified that the three employees listed in the email were "in their 60s," [52-2] at 23, 291:5–19, and the record shows that Advocate hired a forty-two year old to fill Franklin's position, and a forty-four year old to fill William's position, [56] ¶ 70. But this is not sufficient to permit an inference that "low performers" was code for "old employees." The majority of Matthews's reports were above the age of forty, *id.* ¶ 73, and he terminated and disciplined several public safety officers who were younger than Crum, *id.* ¶ 72:

| Name | Age | Disciplinary Action |
|------|-----|---------------------|
| Gillespie Lamont | 37 | Termination |
| Kenneth Brown | 43 | Termination |
| Elizabeth Pinto | 47 | Termination |
| Williams Mosezell | 50 | Level 1, 2, and 3 |
| Ron Belardo | 53 | Level 1 |
| Miguel Perez | 35 | Level 2 |
| Juan Lopez | 31 | Level 1, Termination |
| Dwayne Jackson | 35 | Termination |
| Jarrett Bridgman | 50 | Termination |
| Frederick Jones | 43 | Level 1 |

*Id.* Moreover, as of the filing of Advocate's Statement of Facts, Advocate has not filled Crum's position with another employee. *Id.* ¶ 50.

The parties dispute whether Matthews: (1) hit Crum on the back of his neck during a briefing on May 21, 2012, *id.* ¶ 64; (2) exposed Crum to "hazardous material" (bed bugs), *id.* ¶ 65; (3) denied Crum a bullet-proof vest, *id.* ¶ 67; and (4) told or otherwise threatened other officers to retire, *id.* ¶ 69; [67] ¶ 12. For purposes of this summary judgment motion, I assume Crum's version of these events to be true.

### C. EEOC Charges

While employed at Advocate, Crum filed three charges with the EEOC against Advocate. The first two were on January 11, 2012 and June 11, 2015; for both, Crum filed a charge for race and age discrimination, as well as retaliation. [56] ¶¶ 76–77. He did not file a lawsuit based on either charge, though. *Id.* Matthews does not recall Crum filing these charges,[11] and Favaro learned that Crum filed these charges after Crum's termination.[12] *Id.*

On May 2, 2016, Crum went to the EEOC to complain about his treatment at Advocate; Crum did not recall if he ever told anyone at Advocate that he had visited the EEOC on that date. *Id.* ¶ 74. Neither Matthews, Corbin, or Favaro was aware

---

[11] Crum asserts that Matthews was aware of the EEOC charge because Matthews issued a Management Directive on February 1, 2012, discontinuing the carrying of any fixed or folding blade knives while on duty, in response to Crum's charge. [74] ¶ 47. While it is true that Matthews issued such a directive, the portions of the record that Crum cites do not support his assertion that Matthews decided to issue the directive because of Crum's EEOC charge.

[12] Crum asserts that Matthews as well as management and human resources were aware of his charges since it is part of EEOC's procedures to notify the employer whenever a complaint is filed by one of their employees to give the employer the opportunity to respond to the allegations pursuant to the federal statute. [56] ¶¶ 76–77. But the general proposition that Advocate was notified does not support an inference that Matthews and Favaro—the decision makers—knew of the charges. There is no evidence that EEOC notifications to Advocate were necessarily communicated to Matthews or Favaro.

that Crum intended to file the July 1, 2016 EEOC charge until after he was terminated.[13] *Id.* ¶ 75.

Amongst his voluminous set of exhibits, Crum includes: (1) an EEOC Intake Questionnaire dated September 24, 2015; (2) an EEOC Intake Questionnaire dated May 2, 2016; (3) an EEOC letter dated June 10, 2016, attaching a draft of EEOC Form 5, which Crum dated June 22, 2016; (4) an EEOC Dismissal and Notice of Rights; and (5) EEOC Form 5, which is stamped "Received EEOC JUL 01 2016," and signed by Crum on June 29, 2016. *See* [59-1] at 3–15, 22–23. For both questionnaires, Crum checked the box, which states:

> I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer . . . that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on . . . age . . . , or retaliation for opposing discrimination.

[59-1] at 6, 10. The EEOC's letter explains that it received Crum's draft of Form 5 and that he should review the information, make any corrections, sign and date it, and then send it back to the EEOC in order for him to officially file a charge. *Id.* at 11. The attached draft of Form 5 shows that Crum checked boxes for sex, age, and retaliation, but not for a continuing action; and that Crum identified September 25, 2015, as the earliest date that such discrimination took place.[14] *Id.* Crum admits

---

[13] Although Crum asserts that he had attempted to file an EEOC charge earlier, since the EEOC did not consider that charge officially "filed," Crum has no basis to conclude that the EEOC notified Advocate of his attempt to file a charge.

[14] There are at least three identical copies of this draft EEOC Form 5 in Crum's exhibits. *See* [59-1] at 12–14. I refer to the one on page 12 for simplicity's sake.

that the EEOC did not accept this draft of Form 5 or consider it as "filed"; hence why Crum submitted another form with the same allegations. [56] ¶ 74.

The official Form 5 that the EEOC filed on July 1, 2016 shows that Crum checked the same boxes for the bases of discrimination, that he did not check the box for continuing action, and that he declined to offer a date for the earliest date on which discrimination took place. [59-1] at 23. The narrative that Crum wrote in the "Particulars" section of the form was the same as the narrative he wrote in the draft form:

> I began my employment with Respondent on or about April 4, 1974. My current position is Public Safety Officer. During my employment, I have been subjected to harassment. I complained to Respondent to no avail. Subsequently, I was discharged. . . . I also believe that I have been discriminated against because of my age, 62 (DOB: [redacted]), and in retaliation for engaging in protected activity, in violation of the Age Discrimination in Employment Act of 1967, as amended.

*Id.* at 12, 23. Crum filed this lawsuit on September 15, 2016, alleging claims of age discrimination, retaliation, and a hostile work environment under the ADEA.

## III.    Analysis

Advocate moves for summary judgment on all of Crum's claims, arguing that some of the claims are time-barred and that the remaining claims are not supported by evidence in the undisputed record.

### A.    Time-Barred Claims

In order to pursue a claim under the ADEA, a plaintiff must file a charge of discrimination with the EEOC within three-hundred days of the alleged "unlawful employment practice." *Flannery v. Recording Industry Ass'n of America*, 354 F.3d

632, 637 (7th Cir. 2004). Since Crum filed his EEOC charge on July 1, 2016, [59-1] at 23, Advocate argues that any of his claims that rely on discrete decisions that occurred before September 5, 2015 are time-barred.

Crum disagrees for four reasons. First, Crum argues that his failure to check the "Continuing Action" box on his EEOC charge does not mean that he is prohibited from relying on acts that occurred before September 5, 2015. [55] at 10. (citing *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 168 (7th Cir. 1976); *Kristufek v. Hussmann Foodservice Co., Toastmaster Div.*, 985 F.2d 364, 368 (7th Cir. 1993)). Second, Crum argues that the language in his EEOC charge sufficiently describes a continuing violation because he uses the phrase "During my employment," and his employment spanned over forty years. [55] at 10. Third, Crum asserts that he attached extra sheets to his EEOC form, in which he described Advocate's plan to force him to retire, which included acts that occurred over three-hundred days before the date of the EEOC form. *Id.* (citing [67] ¶ 75; [59-1] at 13–17). Finally, Crum argues that because he brings a hostile work environment claim, which is based in part on an act that occurred after September 5, 2015, the court may consider acts that occurred before that date under 42 U.S.C. 2000e-5(e)(1). *Id.* at 11 (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *Pruitt v. City of Chi., Ill.*, 472 F.3d 925, 927 (7th Cir. 2006) (citations omitted)).

The purpose of an EEOC charge is to put the employer on notice of its employee's complaint and to give the employer an opportunity to settle the dispute

through other means. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 528 (7th Cir. 2003). As such, courts do not preclude a claim due to clerical or technical errors in filling out the form, so long as the claim is reasonably related to the narrative in the EEOC charge. *Id.* at 527. Advocate notes that in earlier drafts of Form 5, Crum identified September 25, 2015, as the earliest date the adverse actions occurred. *See* [59-1] at 12–14. There is no evidence, as Advocate points out, that the EEOC received the extra sheets Crum claims to have attached to his officially-filed charge. *See* [59-1] at 16–17. Notably, Crum did not include such extra sheets as an exhibit to his complaint in this action. *See* [1]. Without more information, Advocate urges the court to find that this single statement that "[d]uring my employment, I have been subjected to harassment" is not enough to signal the existence of a continuing violation, especially because the adverse actions on which Crum bases his action are all discrete events.

I agree with Advocate. "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Morgan*, 536 U.S. at 112–13 (citation omitted). A plaintiff may not use a discrete adverse action that occurred within the time period to bring in another discrete, but time-barred, act. *Id.* at 113. "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* Examples of such discrete acts include termination, failure to promote, denial of transfer, and refusal to hire. *Id.* at 114. Describing an employer's discrete actions as a "practice" does not convert related discrete acts into a timely, single unlawful practice. *Id.* at 111. The nature of hostile

work environment claims is such that they cannot be said to occur on a given day, nor could a single act of such harassment be actionable on its own; these aspects are what distinguish the repeated events that make up a hostile work environment claim from a string of discrete acts. *Id.*

Here, Crum complains of Advocate's discrete disciplinary actions—three CANs, a refusal to transfer him to another shift or Advocate facility, a refusal to hire him for another position, and his termination. Each of those individual decisions could have been actionable; they also do not relate to one another in a way that creates a basis for a hostile work environment claim. To the extent that those discrete acts occurred before September 5, 2015, they are time-barred and Crum may not pursue them as discrimination claims.[15]

## B.    Discrimination Claim

The ADEA prohibits discrimination against individuals who are over forty-years old. 29 U.S.C. §§ 623(a), 631(a); *Formella v. Brennan*, 817 F.3d 503, 514 (7th Cir. 2016). At summary judgment, district courts consider the evidence "as a whole" to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A court may review the evidence through the *McDonnell Douglas* burden-shifting framework; but ultimately, the court must conduct a cumulative review of the evidence to determine whether a reasonable factfinder could find that age was a

---

[15] Given my conclusion on the issue of timeliness, I do not reach Advocate's laches argument.

but-for cause of the adverse employment action. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under the *McDonnell Douglas* burden-shifting framework, plaintiff bears the initial burden of establishing a prima facie case of discrimination: (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with his employer's legitimate expectations, (3) he was subjected to an adverse employment action, and (4) the employer treated similarly situated employees outside of his protected class more favorably. *David*, 846 F.3d at 225. "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (citation omitted). The parties do not dispute the first element.

### 1. *Job Performance*

Advocate argues that Crum failed to meet its legitimate job expectations. As evidence, Advocate points to Crum's Levels 1, 2, and 3 warnings, his meeting with Matthews and Corbin on April 25, 2016, and his final failure to follow policy on May 31, 2016, which ultimately led to his termination. Advocate also notes that Crum took advantage of the multi-step progressive disciplinary policy, as well as the conflict resolution policy, and despite these opportunities for course correction, all signs pointed to terminating Crum. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (employee's inability to challenge evidence of his policy violations meant he could not show that he was meeting job expectations).

In response, Crum asserts that his average performance only needs to be high enough to merit continued employment, [55] at 12 (quoting *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977)), and that his history of meeting expectations—which was only interrupted by Advocate's new policy to move old employees "up or out"—satisfies that standard. *Id. Flowers* stated that an employee, by showing that his performance was sufficiently high to merit continued employment, could raise an inference that some other factor was involved in the decision to terminate him. Crum's effort to emphasize his past performance reviews does not raise such an inference, however. Evidence of an employee meeting expectations in the past is "irrelevant." *Naik*, 627 F.3d at 600. What is relevant is whether the employee can show that he was meeting expectations at the time of termination. *Id.* Here, the record clearly establishes that Crum was not meeting Advocate's legitimate expectations at the time it terminated Crum.

Crum also argues that not only did he meet expectations in his reviews, but also, he met or exceeded expectations on a regular basis by doing things like taking undesirable work assignments, policing the midnight shift by himself, and assuming the responsibility for setting up a new area of the hospital, the Annex. [67] ¶ 4. As a matter of law, however, Crum's own assessment of whether his job performance met expectations does not contradict Advocate's negative evaluation, nor does it does create a material dispute of fact as to this element. *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998). These

assertions do not show that Crum's performance met Advocate's legitimate expectations.

## 2. *Similarly Situated Employees*

Deciding whether employees are similarly situated is a "flexible, common-sense, and factual" inquiry. *David*, 846 F.3d at 225. To make this showing, a plaintiff must present a comparator who is similar enough "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel." *Filar v. Board of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008). Crum does not succeed in this endeavor. He points to three public safety officers who shared Matthews as their supervisor, who had the same job description and performance standards, who were at least twenty-years younger than Crum, and who were not terminated for their more egregious (according to Crum) policy violations. Yet, Crum does not have personal knowledge of the investigations Advocate initiated into these employees' policy violations and why Advocate decided not to terminate each of those employees. [56] ¶¶ 53–55. In short, Crum's opinion is uninformed and it does not advance his argument here.

As Advocate points out, Crum does not identify any comparator who committed policy violations with the same frequency and degree—as judged by Advocate's progressive disciplinary policy—as Crum. Meanwhile, Advocate points to evidence that it terminated several public safety officers who were substantially younger than Crum, and who were over forty-years old (the minimum age for discrimination under the ADEA). Although such evidence is not dispositive, it remains true that it is "hard to make out a case for age discrimination when

19

younger workers are also being shown the door." *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 454 (7th Cir. 2009). Crum fails to establish that Advocate treated similarly situated employees more favorably than him.

### 3. *Materially Adverse Employment Action*

A materially adverse employment action is one which causes a significant change in the plaintiff's employment status. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014). Significant changes impact the employee's current wealth, career prospects, or work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise negative alteration in the workplace. *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007). But, "not everything that makes an employee unhappy is an actionable adverse action." *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000).

Several events that Crum identifies as materially adverse employment actions do not, as a matter of law, qualify: negative performance reviews, *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014), refusals to grant a transfer to a lateral or lesser position that would not offer greater compensation, responsibilities, or title, *Riley v. Elkhart Cmty. Schools*, 829 F.3d 886, 892 (7th Cir. 2016), and harder work assignments with less support,[16] *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Relatedly, other issues that Crum

---

[16] In his affidavit, Crum complains that his co-workers left him and he was forced to cover the nightshift, *see* [67] ¶ 38; and in his deposition, he complains that he had to handle disturbances by himself, *see* [52-2] at 19, 274:20–22. Crum now characterizes these situations as Advocate endangering him. Without more evidence, I find that they are more akin to situations where employees have to take on more responsibility or endure a more challenging assignment.

experienced on a few occasions, but that were not so harmful as to significantly change his workplace, do not rise to the level of a materially adverse employment action because "a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000). For example, receiving cartoons of characters with a "pot belly, oversized pants, a stained shirt, and other traits" in his mailbox, being near "hazardous material" (bed bugs) while at his work station, being refused a bullet-proof vest, and feeling humiliated when he returned to work after the arrest do not count. [67] ¶ 76. Furthermore, there is nothing to suggest that those events had anything to do with Crum's age.

Crum's on-the-job arrest prompted Advocate to investigate the incident and place Crum on a suspension without pay. After Advocate decided Crum's actions did not warrant any discipline, Advocate granted Crum his back pay for the duration of his suspension. A brief delay in payment due to a pending investigation does not constitute a significant change in Crum's wealth; thus, Crum's suspension without pay followed by back pay was not a materially adverse employment action.

While those events and experiences do not count, Crum satisfies this element by pointing to the Level 3 CAN and his termination. Each of those constitutes an adverse employment action by Advocate.

4. *Legitimate Non-Discriminatory Reason*

Advocate articulated a legitimate non-discriminatory basis for each of the materially adverse actions. First, Advocate gave Crum a Level 3 CAN after

investigating and confirming that Crum failed to properly screen a patient according to company policy, which led to a box cutter going into the facility with the patient's property. Second, the decision to terminate Crum arose after Advocate gave Crum a Memo of Concern, followed by a month-long period in which Crum continued to violate department policies by failing to properly communicate with fellow public safety officers and to double-check a patient's property.

### 5. *Pretext*

Since Advocate has proffered a legitimate, non-discriminatory reason for these actions, Crum must present evidence raising a triable issue of fact that these reasons are pretextual. *See Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590, 596 (7th Cir. 2017). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation omitted).

Crum argues that the Level 3 CAN and the termination were baseless because he did not violate Advocate policy; that Advocate took those actions pursuant to the "up or out" policy concerning its old employees; and that Advocate hindered truthful investigations into the underlying incidents to prevent discovery of its real motive. Crum's subjective belief that he did not violate policy when Advocate maintains that he *did* violate policy does not show that Advocate's belief was dishonest; rather, it shows that Crum and Advocate have different beliefs. Additionally, Crum has no evidence that Advocate had a plan to replace older

workers with younger workers,[17] nor can he rebut or explain away the evidence that the majority of Matthews's reports were over the age of forty and that Matthews terminated public safety officers who were younger than Crum. Similarly, Crum cannot overcome the evidence that Advocate interviewed people with knowledge of the incidents and reviewed relevant surveillance footage before concluding its investigations and deciding to discipline or to terminate Crum.[18] As a result, there is nothing from which a reasonable jury could infer that Advocate's investigations were a cover up for age discrimination.

Finally, Crum says that Advocate repeatedly pressured him to retire. In his depositions and affidavit, Crum describes how other employees frequently made comments urging him to retire. With respect to the individuals who had authority to terminate Crum—namely Matthews and Corbin—Crum only identifies two occasions in which retirement was an issue: (1) on September 21, 2015 when Matthews tried to intimidate Crum into retiring by placing his hands on a gun; and (2) on June 23, 2016, when Crum met with Matthews and Corbin and they told him to save himself the embarrassment of being fired and just retire. Assuming these events occurred, "requests that an employee retire are not necessarily a reference to the employee's age." *Halloway v. Milwaukee Cty.*, 180 F.3d 820, 825 (7th Cir. 1999). Without evidence that Matthews and Corbin made other ageist remarks to Crum, an inference is not raised that such discussions were instances of Advocate

---

[17] Crum's argument that Advocate added younger employees after old employees retired (without citation to or support in the record) does not change this conclusion. *See* [55] at 22.

[18] Crum's reliance on a nurse's statements is inadmissible hearsay and cannot be used to undermine the efficacy of Advocate's investigation.

discriminating against Crum on the basis of his age. *Id.* at 825 n.5. While Matthews's intimidating conduct would be alarming, it was not a reference to Crum's age. Crum has not made a showing that Advocate terminated him because of his age or that Advocate held disingenuous beliefs that Crum violated policies and deserved to be terminated. Crum cannot satisfy the *McDonnell Douglas* test.

6. *Cumulative Review*

Assessing evidence in the undisputed record cumulatively leads to the same conclusion as reviewing the evidence through the *McDonnell Douglas* framework—Crum's claim for age discrimination under the ADEA does not survive summary judgment. Crum's history of disciplinary issues shows that he was not a reliable employee. Advocate's processes for investigating Crum's behavior before deciding on a disciplinary action, which included using testimony from relevant witnesses and surveillance footage, and Advocate's processes for considering Crum's disagreement with the disciplinary actions he received, which involved members of HR, who were not directly involved in supervising Crum, suggest that disciplinary decisions were carefully considered and that errors could have been corrected. Even if Advocate employees pressured Crum to retire, there is no evidence to suggest that Advocate terminated Crum because he refused to retire. Instead, the evidence shows that Crum's errant ways were the but-for cause of Advocate's decision to discipline him and to eventually terminate him. Advocate is entitled to summary judgment on Crum's age discrimination claim.

## C.     Retaliation Claim

To establish a retaliation claim under the ADEA, Crum must show: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the two. 29 U.S.C. § 623(d); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016). Retaliation under the ADEA must be a but-for cause of a materially adverse action; retaliation that is merely a contributing factor of an adverse action will not suffice. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011).

Crum identifies his internal complaints, EEOC charges, and an Illinois Department of Human Rights complaint as his statutorily protected activities. Specifically, he says that he complained of discrimination based on his age starting in May 2011, but the undisputed record does not support that assertion. Rather, the record shows that Crum's internal complaints described how other employees failed to follow Advocate policy or teased and threatened Crum for unspecified reasons. Internal complaints such as Crum's, which do not reference age discrimination, are not protected activity under the ADEA. *See Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). He also says that he began filing discrimination and harassment charges against Advocate with the EEOC and the IDHR in February 2012. While it is clear that those activities constitute statutorily protected activity, *see Kuhn v. United Airlines, Inc.*, 640 Fed. App'x. 534, 538 (7th Cir. 2016); *McKenzie*

*v. Illinois Dep't. of Transp.*, 92 F.3d 473, 483 n.8 (7th Cir. 1996), there is no causal connection between these filings and the decision to terminate Crum.[19]

Given that Advocate terminated Crum on June 23, 2016, the earlier-filed EEOC charges and the IDHR complaint, on their own, do not support a causal connection. "The inference of causation weakens as the time between the protected expression and the adverse action increases, and then 'additional proof of a causal nexus is necessary.'" *Oest v. Illinois Dep't. of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001). Evidence that one event precedes another does not prove that the first caused the second; there must be other evidence that reasonably suggests that the protected activity was related to the employer's decision to terminate the plaintiff. *Burks v. Wisconsin Dep't. of Transp.*, 464 F.3d 744, 758–59 (7th Cir. 2006). Crum does not present any additional evidence connecting these filings with Advocate's decision to terminate him. Beyond his assertion that Advocate knew about these filings because the EEOC and the IDHR notify employers of such filings, Crum has not proffered any evidence that the relevant decision makers at Advocate had the requisite knowledge about the filings before they decided to terminate him. *Smith*, 674 F.3d at 658 (employer must have actual knowledge of employee's protected activity for a retaliation claim). On the other hand, there is evidence that Matthews, Corbin, and Favaro did not know about the July 1, 2016 EEOC charge until after Advocate terminated Crum.

---

[19] Crum cannot rely on the CANs or the negative performance review as materially adverse actions because there is no evidence that those acts resulted in a "quantitative or qualitative change in the terms or conditions of employment." *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (citation omitted).

Since the undisputed record shows that Advocate terminated Crum after a period of poor performance and repeated policy violations, Crum cannot establish that his filing of EEOC charges or the IDHR complaint were the but-for cause of his termination. Consequently, Advocate is entitled to summary judgment on Crum's retaliation claim.

### D.       Hostile Work Environment Claim

The Seventh Circuit has assumed that a claim for a hostile work environment exists under the ADEA, but it has never ruled on that precise issue. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005). I will assume the same. In order for Crum's hostile work environment claim to survive summary judgment, he must provide sufficient evidence that (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on his age; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). For the same reason that Crum's other claims fail, so too does his hostile work environment claim—Crum has not offered any evidence that the discrimination or harassment he says he faced was based on his age. Absent evidence of a nexus between the alleged harassment and his age, Advocate is entitled to summary judgment on the hostile work environment claim.

# IV.    Conclusion

Defendant's motion for summary judgment, [49], is granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: February 26, 2018